23-5046 Good morning your honors and may it please the court. My name is Evan Talley from the law firm Dunlop Cotting in Oklahoma City. I represent the appellants in this case Creager Services LLC and Carey Creager and to the extent I have it I'd like to reserve two minutes for rebuttal. We're here today on the district court which is the northern district of Oklahoma, grand and summary judgment in favor of the appellees I Dig Texas on the appellant's claims for copyright infringement and Lanham Act violations. Specifically we are here today because it is the appellant's position that the district court erred in misapplying the fair use factors under the Copyright Code 17 U.S.C. 107 and by inappropriately weighing evidence and resolving inferences and issues to be taken from that evidence in favor of the movement appellees on Creager Services Lanham Act claims. We'd like to focus first on the copyright issues. This does raise several new issues, one of which is a first impression for this court or for this circuit. That's going to be the issue of comparative advertising that the district court pulled from the bodies of law of the Ninth Circuit and the Fifth Circuit and adopted and applied in this case. In doing so, the district court applied that comparative advertising regime in analyzing the first fair use factor which is the purpose and character of the use of the allegedly infringing use. It is our position that the comparative advertising has no place in copyright law. It is a regime that has been adopted in unfair competition and trademark law that is specifically called for by the statute under the Trademark Code as an example of fair uses. In the trademark context, it is providing information using a source identifier of two eight out of ten customers prefer the structure and fit of a Nike over Reebok. I'm using the trademark, I'm using the source identifier of Reebok and comparing the two but I'm not assuming that the data is correct, I'm not making something up. In the copyright context, and that's what unfair competition is all about, is about protecting goodwill and protecting those source identifiers. Copyright law is about protecting creativity for artistic works and expression. In allowing a quote unquote fair use in order to compare products, which we have the position that there wasn't even really a comparison of products done here, we are undermining what the copyright code is all about. Copyright is about research, creativity, scholarship, comment, news reporting, none of which there's no mention in the fair use statute or in the fair use case law about allowing an infringing use to comparatively advertise. It is the appellant's position that the district court erred in adopting that regime, specifically in its analysis of fair use factor number one. Even if this court does go along with the district court in the Ninth and Fifth Circuits adoption of that comparative advertising regime, the appellant's position that it was wrongfully applied here. The district court took, analyzed two different cases, one of the Ninth Circuit cases, Stoney v. Bleen, which we have addressed throughout this section of our briefing, and a Fifth Circuit case, Triangle Publications. What those cases and the subsequent case law is clear is that in a comparative advertising context, the amount that may be taken for fair use is only that which is reasonably necessary to achieve the goal that is stated. Here, that goal was to provide the consuming public with information that a post driver, which is an implement that is attached to a skid steer, we're dealing with heavy machinery and equipment here. First time I've ever been involved with this machinery. We've learned a lot about different implements, but we're dealing about post drivers. The stated purpose from iDigTexas in comparatively advertising these products was to put the not in America. In order to accomplish that purpose, the appellees admittedly right-clicked and copied an image from a Craigslist post of my client, did not alter it, and incorporated it into its own advertisements to say that it was not, this product did not originate in the United States. Nowhere in those copyrighted works, which are two images, is there anything that says this product originates in Montana. It's called a Montana post driver. There's nothing that says this product originates in Montana. There's nothing that says this product does not originate in China. There's nothing like that. It's just a picture of this implement or stacks of implements on pallets sitting in a warehouse. That's all it is. There's nothing about using that image of itself that accomplishes the stated goal. To call the product to mind so you can then criticize it. Sure. I'm willing to acknowledge that. Actually taking a Montana post driver, some image of a Montana post driver, may have accomplished the goal. That it calls it to mind and says, hey, look at this product. It's made in China. We're selling one that, as a matter of fact, is substantially made in the United States where pieces of it are made in China, a whole other issue. The problem is that the appellees did not have to take the copyrighted works to do that. How do we know that? We know that because the appellees on its own website, at a time that it sold the Montana post driver, the exact same product that we're talking about here that my client sold, iDigTexas at one time sold it itself. On the opening page of its website, the background image was a stack of its own Texas or Montana post drivers that it sold at one time. That's a dependent site 165. We've also taken the position that to the extent that they were no longer selling Montana post drivers and didn't want to go take pictures or didn't have any more at their shop, they could have gone elsewhere. They could have purchased their own, then taken a picture of it and accomplished that goal of saying, look, we brought this product. It's from China. It's shoddy, whatever the stated objective is. We know that that could happen because at Appendix Site 976, there's an example of a in which iDigTexas took its own picture of a Montana post driver sold by one of our vendors at our vendor's lot, and then iDigTexas incorporated it into its Craigslist post. It had at least two other means of accomplishing this goal and did not need to right-click  As the Supreme Court resoundingly affirmed in 2021 in the Google v. Oracle case, fair use factor number one, to the extent there is a comparative advertising prong, it is only that which is reasonably necessary to do so. It is our position that it was not necessary at all to use the copyrighted works. Factors two and three in the fair use factor... Sir, could you move on to factor four? Sure. The market effects. Absolutely. Factor four has been called the most important factor in the fair use analysis. Factor one is a weighty factor as well, and it seems to get quite a bit of attention. It needed attention here because we had those two doctrines going on, but factor four was really the next one I wanted to discuss. It is appellate's position that the district court fundamentally erred in misapplying the standard. There is actually a statement, I believe it's in appendix 1020, where the district court says that in the Campbell case, the Supreme Court expressly rejected a presumption in instances of mere duplication. Campbell actually says the exact opposite, that it recognizes that there still is a presumption in cases of mere duplication. Campbell was about something else. It was about parity, and it was saying, we're not going to recognize a presumption in those cases. Even if we agree with you on that, you still have to show us that the infringement was to supplant your copyrighted image, as opposed, for some other reason, like criticism of the product depicted in your copyrighted image, right? Are we talking about supplanting of the market for the copyrighted image? Yes. The factor is actually the market of the potential, or the supplanting of the potential. Either way, we're talking about the market for the picture of the post drivers. Sure. Not of the post drivers. Not of the post driver itself, but of the images of the post driver. Yes. I understand the distinction. I don't see any, I mean, is there any evidence that the potential or actual market for the image of those post drivers was affected by the, you know, made in China stuff on the image? Appellants have not presented any evidence that the market for the pictures has actually been affected, that there is actual effect. Our position is that, two points here, that it is the burden of the defendant, because this is an affirmative defense, to come forward with evidence that the potential market has not and will not be affected. That's what the case law says. Also, of course, we believe that the presumption should have been applied here, in case of mere duplication. But admittedly, my clients never sold, or never licensed, never assigned the images, the copyrighted works. They only used them to incorporate into their own advertising. There is no evidence in the record that the images have actually supplanted the market for our images. What there is evidence of is declining sales, and that the replacement of- It is of the post driver. It is of the post driver, Your Honor. So it's irrelevant. Well, it's- It's irrelevant to the market for the copyrighted image, which is the picture of the post drivers. Sure, Your Honor. I will admit that. I mean, there is no evidence, and I'm not going to argue against the fact that there was evidence that- And how could they prove, you say it's, you know, it's- How could the appellees prove- Sure. They could use- Confused by that argument. They could do so through consumer evidence. They could go take a poll of potential purchasers of post drivers, or potential folks who actually go look at these images, right? That these are the things that are- Do we really even need that here, where it's quite clear that there is no harm to the market for the copyrighted image itself? It's a given. Nobody's arguing it. Nobody's arguing that there actually is evidence of harm? Well, right. Well, and that's conceded. I think the position is that the proper application is on the potential harm to the market. Well, address that in light of the fact that it is such an important element, and there's just nothing here on that. Address how we do the balancing, then. Well, I think that's why the presumption exists, is because the factor is the potential, that it is a hard thing to do to come up with actual evidence of a market where, admittedly, you're not involved in active licensing. It's not like the photographer in the Warhol case who took images of prints, right? These things actually had an established market, and that's what that was all about, right? There wasn't an underlying product. It wasn't about selling prints. It was about selling images of prints. But there are many instances in advertising, especially, where images are used to drive consumer purchasing decisions, right? The same thing that we talked about in achieving the purpose of actually sending this message that these things aren't made in China. These images actually indirectly affect those decisions. Well, but the issue is whether these images affected the market or, I guess, potential market for the copyrighted item, which is the picture. And you don't get a presumption, as I understand it, and please correct me if I'm wrong, unless the allegedly infringing one is to supplant the copyrighted one. It's supposed to be... That's where the presumption comes in, if you're trying to take their place in that potential market, which I don't think that's what we have here. That's not entirely correct, Your Honor. Okay, please correct me. The presumption arises in instances of mere duplication for commercial purposes. That's when the presumption arises. It is not... The objective, and you'll see the case law analyze this, is that there is a presumption because the fair use is only good to an extent that you're not supplanting the market for something. But the standard for the presumption is mere duplication for commercial purposes. And that is what the Campbell case recognized in the Supreme Court and courts in this circuit, including in the Western District of Oklahoma last year. So if we don't think it's mere duplication, then you wouldn't get a presumption. I would agree with that. If there is a finding that this is not mere duplication, then I think that the dicta from Campbell supports that the Supreme Court was not willing to extend the presumption to cases beyond that. But here we have right-click copy. No alterations. Well, right-click copy, and then putting over it, made in China, in American flags, as I have it here. And I agree. The images were used in an array. However they do, there are instances in which they appear individually, and factor three of the fair use factors is actually instructive here, because it is the amount of substantiality of the copyrighted work that was used. It is the entirety of the copyrighted works that was incorporated into something else. That doesn't defeat the mere duplication of the use. Can I answer your question? I know you only have two seconds left. Because this, I don't think, was answered, addressed, no fault of anybody's, in the briefs. I was a little puzzled on this presumption of harm issue. You make an argument based on the fourth factor that there's a presumption of harm, and then when IDT presents an alternative argument to affirm, based on the absence of an actual injury, Krieger doesn't say, well, we had harm. We didn't have direct profit. You argue indirect profit. So is it academic? You have a presumption of harm, but you really, in response to IDT, you're not advancing a I think what we're advancing in response to that order is the difference between harm and quantifying damages, the indirect profits generated from the sales of these things. The evidence that we do have, and really one of the things that started this whole dispute between the parties, we cited to it in our briefs, was the email that, you are making me rich, an email that is in response to a Craigslist post of ours that the link clearly shows that the copyrighted works appeared in it, and IDT said, you are making me rich. So that leads to this indirect profits theory of, okay, well, what sales did you generate from selling the post drivers that were in the ads? I do understand all that, but in response to the argument that there was no actual harm, your response was not, but we have actual harm. Your argument was, well, we have indirect, you, IDT, have indirect profit, and we want that indirect profit to call back to us. Sure, and I think implicit in that is that the harm that is caused to us is the additional sales that they generated by using our images. That is the harm that is articulated that gets you to the indirect profits. There still has to be proved a link between the infringing act and those profits and saying that those were actually sales lost by us. In your brief, you did concede that the threshold burden to show a nexus was yours, not theirs. That's correct, Your Honor. So what evidence was there on the alternative argument to affirm that there was some sort of nexus between these two advertisements with the copyrighted images of the Montana from those two particular, the use of those two particular copyrighted images in those two particular advertisements? And I'll mention it again. We cited it in the brief. It was the message from ID Texas to our client that said, you are making me rich, specifically referencing the Craigslist post of ours from which the copyrighted images were taken. We believe that is a factual predicate to establishing that nexus. Okay. Thank you. Thank you, Your Honors. Good morning. May it please the court, Zach Goob from the law firm of McAfee and Taft on behalf of the appellees. With me is Appellee Mary Merrick and Appellee Thomas Merrick. First I want to address the indirect profits issue on the copyright claim first since that's where Mr. Talley ended. The email of you are making me rich that was noted in appellant's reply brief is a heavily redacted email that doesn't reference Copyright Works or the use of Copyright Works. The court can look at that. It is at page 162 of the appendix is where it's referenced in the amended counterclaims. The image itself is at 181. But more importantly, it wasn't raised in the motion for summary judgment briefing below. You are making me rich was not an argument made with respect to indirect profits. If the court goes and looks at the appendix of 875. Was it raised in the reply brief? Well, they only filed the response brief. It was not raised by appellants below as a basis for the causal nexus of indirect profits. That's at the appendix of 875 through 876. That's because it doesn't show that basis, Your Honor. With respect to Justice McHugh's point earlier on the. I'm just a judge. Judge, sorry. Sorry, Judge McHugh. Just a matter of time. That's right. That's right. I just foresee it. With the presumption of harm for mere duplication. Campbell teaches that that is a market replacement. And that's not what IDT's use was here. That presumption does apply in the instance of a market replacement. And as you noted, Judge, there was not a replacement. IDT's use was not a replacement for any market of the Krieger images at issue. As Judge Moritz noted, proving a negative is difficult. You asked Mr. Talley how we would do that. We did. In his deposition, Mr. Krieger admitted that he never licensed or sought to license. That he never got a valuation for any of these images. And that is at the appendix 231 is where that statement of fact is raised. It was admitted at 854. Also at 231, we raised the statement of fact admitted at 854 that there was no evidence that use of Mr. Krieger's images caused Mr. Krieger or Krieger services any harm. The use at issue did not cause any harm. The fourth factor, the most important factor was proven by EDT on its affirmative defense. There was no evidence to create a genuine issue, genuine factual dispute as to that. The lack of market harm shows that that use was a transformative one. Mr. Talley starts off his argument with respect to the concept that comparative advertising cannot be a fair use. We proposed to the court that argument had been raised or had been waived because it was not raised below. If the court goes and looks at the appellant's summary judgment response, they even noted at page 874 in the appendix that policies around fair use for parity and comparative advertising are arguably similar. Not only did they waive this argument that this is not a copyright issue, it's a trademark issue. They acknowledged that parity and comparative advertising fulfilled the same policy purposes under the Copyright Act. Well, whether they raised it or not, if we were to go down that road, we have to adopt it as the law of this circuit. So, I mean, you know, we would have to wrestle with it whether they raised it or not if you're going to rely on it. Sure. So, ultimately, as the appellants recognized in their brief and as the Warhol decision recognizes, a purpose of the Copyright Act is to encourage learning. That's what this comparative advertising did. That's what the blame advertising did. That's what the triangle publication advertising did. You're encouraging learning by informing the public about the products at issue to help them make a rational purchasing decision. Well, I'm on a different topic, so why don't you follow through. I'm still focused on the presumption. And the argument that was made is if you have a mere duplication, then you get the presumption. And that we here have a complete duplication, you know, copy-paste. Yeah. I mean, are they wrong in stating that if you have a mere duplication, you get the presumption? It is a mere duplication if it's used for commercial purposes as a market replacement. Okay. And that's not what happened here. And it wasn't simply a copy-paste. Go compare Craiger's use of these images on pages six and seven of the appellant's opening brief with IDT's use of these images on pages nine and ten of that same opening brief. The differences in the use are evident from themselves. In the use. And so you're assuming that it's transformative if you use it for a different purpose. You know, if I hire a personal photographer to take, you know, glossy photos of myself, and I copyright those, and let's say you use it for some sort of other purpose, you're saying, well, it's transformative because I used it for a different purpose. But it's the exact same photo. Think dartboard. You see? I withdraw my nomination. Sorry. No. And that is why fair use is a fact-intensive, you know, and it matters based on context. The context here is that this isn't a mere substitution. And that's the important thing. I mean, as Warhol recognized that was discussed in Campbell, the issue of whether or not something is transformative is whether or not it's a substitute. This was not a substitute. And that's why where the first factor and the fourth factor simply converge. And where you have no market effect, it only goes to show that it's not a substitution. And where you have, and where you might have a market effect, or some evidence of some market effect, then perhaps the mere duplication argument would have weight. But that is not the case here, Your Honors. So. And the market effect has to be in the market for the copyrighted item. It has to be a copyright harm, i.e. the market for the copyrighted issue, not the product. So if they have lost sales and Texas has increased sales of the actual diggers, then what needs to happen? What type of nexus do they have to show to connect up those damages with the infringement claim? Had there been an attempt to license to resellers perhaps? But that didn't take place. I mean, most of the appellant's briefing focuses around Maui Gym with this idea of a market being affected. But those facts are completely different from these. There were authorized resellers and there were unauthorized resellers and knockoff products. This wasn't a knockoff product, but more importantly, Mr. Kreger admitted that he never sought to license. There was literally no market. And although the appellants argue for the potential market, they also cite to Harper & Row on page 17 of their reply, which notes, one need only show widespread challenged use would adversely affect a potential market. No such showing occurred here. And I will turn to the Lanham Act claims, unless your honors have any questions about the copyright claims. And I would, I would posit that with respect to the second and third factors, they are at best neutral for Mr. Kreger, but because the first and fourth factors weigh in favor of IDT here, then the district court was correct on the facts of this case that this was a fair use. With respect to the Lanham Act claims, the appellants failed to show falsity, materiality, injury, and deception. They asked the district court below and they asked this court to speculate or presume as to each of those requisite elements or to fill the hole, to fill an evidentiary hole to show the same. In their briefing to this court, the appellants focused very heavily on exhibits 8, 9, 10, and 11 of their response brief, which are at, it's appendix 969 through 976. And a large portion, and a large portion of that briefing concerns the keywords and this issue that even though the exhibits are on their face incomplete, if you go look at exhibit 10, you'll see keywords and that means that's the end of the ad and the district court shouldn't have made, shouldn't have foreclosed the possibility that there was some inaccurate advertising there. But if your honors go and look at exhibit 10, one of the documents given to the district court, it is facially impartial and it doesn't actually reference any IDT product. It focuses wholly on Montana postwriters. It doesn't have any false or misleading statement of fact about an IDT product. It doesn't even talk about them. So the appellant's argument about keywords and trying to suggest there's some false and misleading statements somewhere or otherwise in there just doesn't hold weight. Well, the district court was clearly incorrect, wasn't it? To rely on IDT's depiction of the photographs rather than Krieger's. Are you referring to the Lanham Act claims on the Craigslist ads? Right. So what the district court noted was that the appellants failed to, with the evidence they submitted, provide any question of fact as to a false and misleading statement. Exhibit 11, which was one of the exhibits given, it is clearly incomplete and it has the same statements, but not the disclosures that were in IDT's exhibits 16 and 17. But they were clearly different ads. I mean, there was all caps in one and regular lettering in the other. So sure, it didn't have the caveats that IDT said, but that's Krieger's whole point. You're cherry picking your ads. I would suggest to the court that it was appellants who cherry picked with just a one page when it was clear that there was other text there. I mean, in Zoeller, this court noted that literal falsity or falsity is an examination of the full context of the ad. By giving the district court only one piece, the piece that it wanted the district court to focus on, and without other text clearly otherwise in the ad, it required speculation and an unreasonable inference by the district court to jump to the conclusion those disclosures were missing. In the other exhibit, Exhibit 10, at 974, like I just noted, the appellants make this long argument about keywords, but there's not even a reference to IDT products in Exhibit 10 that could be false or misleading. And in Exhibits 8 and 9 are just montages and also one page excerpts of ads that do state we provide 100% American-made skid-steer attachments, but the evidence of record shows that that is the case. Well, what about the Canadian bolts? What about the Chinese devices that make the things work? Right. Those aren't American. The district court noted at appendix page 1020 that that can be a clear and unambiguous message that at least one product offered by ITT is wholly manufactured in the United States. The appellants did not show that they lack such a product. But why not? I mean, but that's my question. Even the premium model does rely on components that come from Canada or China. So the Texas post drivers that are really relied upon in the appellant's briefing is only one type of skid-steer attachment. There are thousands of these things, different types of SKUs. So by trying to make the inferential leap that the reference to skid-steer attachments necessarily means this particular product... So if we sell 1,000 devices, one of which, you know, sells for a dollar and a quarter, is completely made in the United States and all of the rest of them are made in China, it's still literally correct. Yes. Yes. And in the appendix at 595 is the notation about products being manufactured in the United States wholly, which is supported in the record at 605 and 606. It was noted in our reply. And just a note, Your Honor, the Canadian nuts and bolts were used because primarily IDT gets them from a Tulsan supplier and only having to use it sporadically. Alternatively, another basis would be materiality, but I do see I am out of time. And so unless Your Honors have any questions for me, I thank you for your time. Thank you. Ellie, is the appellant out of time? Okay. Thank you, counsel.